SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Fernando Carrero, Jr.** (A-13-16) (078071)

**Argued March 13, 2017 -- Decided May 22, 2017**

**Timpone, J., writing for a unanimous Court.**

In this appeal, the Court considers the propriety of a passion/provocation manslaughter jury instruction.

On November 6, 2007, Jose Hall was shot twice at Kerrilyn Lowenstein's house in Lyndhurst, where she lived with her parents. At the time of the shooting, seventeen-year-old Lowenstein was dating defendant Fernando Carrero, Jr., who was sixteen. Before dating defendant, Lowenstein had dated Hall's close friend, Corey Hicks. In 2003, after Lowenstein and Hicks ended their relationship, Hicks moved into the basement of Lowenstein's house. According to Lowenstein, defendant specifically told her that he did not want her speaking to Hicks or Hall, despite her repeated protestations that she had no romantic feelings for either of them.

In the week leading up to the shooting, defendant stayed overnight at Lowenstein's house. On the date of the shooting, Lowenstein's mother told her that defendant could not stay at the house that night because Hicks and Hall would be there. Defendant called his sister to ask if he could stay with her, but she did not answer. Lowenstein and defendant went to Lowenstein's house, planning to try to reach his sister again later on. While they were sitting at the kitchen table, Hall came up from the basement. He asked Lowenstein why she had not told him that she had secured a job. Defendant asserted that he told Hall to stop speaking to Lowenstein.

Lowenstein testified that she was fearful of an impending fight between defendant and Hall, so she left the kitchen to get her parents. While she was out of the kitchen but near the stairs, Lowenstein indicated that she heard Hall yell, "whoa, whoa, whoa," followed by the sound of a gunshot. She ran back to the kitchen and saw Hall lying on his back with defendant standing over him, pointing a gun at him. Hall was lying in a defensive position saying, "whoa stop, whoa stop." Lowenstein stated that she pleaded with defendant to "just leave." When he did not respond, she attempted to pull defendant's arm away, but he fought off her grip. Lowenstein testified that defendant then shot Hall in the head.

Defendant's version of the shooting differed. He testified that, after Lowenstein left the kitchen to find her parents, Hall told him "this is the last time you're going to come in this house. And stop talking to [Lowenstein]." Hall then reached under his shirt and pulled a gun from his waistband. Defendant tried to grab the gun from Hall and the gun went off during the struggle. After the first shot, Hall fell to his knees but continued to struggle. Lowenstein reentered the room and jumped on defendant's back. During the three-way struggle for the gun, the gun fired while aimed at Hall's head.

Hicks, who was in the basement at the time of the shooting, testified that he ran upstairs after hearing yelling and "thumping" noises. When he got to the kitchen, he found Hall on the floor bleeding and saw defendant run out the back door with the gun in hand. Hall died two days later in the hospital. Defendant was arrested the morning after the shooting.

A Bergen County grand jury returned an indictment, charging defendant with first-degree murder; second-degree possession of a weapon for an unlawful purpose; third-degree possession of a handgun without the requisite permit; and third-degree hindering apprehension.

At the close of evidence, defendant requested an instruction on passion/provocation manslaughter as a lesser-included offense of murder. The court denied the request. The jury subsequently found defendant guilty on all counts.

1

In a split opinion, a majority of the Appellate Division reversed defendant's conviction, concluding that, when considered in the light most favorable to defendant, the evidence adduced at trial "provide[d] a rational basis upon which a reasonable jury might make a finding of passion/provocation." The majority found defendant's testimony that Hall drew a weapon and pointed it at him supported a passion/provocation charge. A dissenting panel member concluded that there was no evidence to support a passion/provocation charge and that a passion/provocation manslaughter verdict "would have required the jury to reject both defendant's and the State's versions" of events. The State appealed to this Court as of right. R. 2:2-1(a) (2).

**HELD**: The trial testimony presents a rational basis on which the jury could acquit defendant of murder but convict him of passion/provocation manslaughter. Although the passion/provocation charge is inconsistent with defendant's theories of self-defense and accidental shooting, when the evidence supports such a charge, a defendant may be entitled to the requested instruction regardless of whether the charge is consistent with the defense.

1. As a threshold matter, the Court rejects the assertion that State v. Funderburg, 225 N.J. 66, 81 (2016), is controlling here. That case addressed the failure to provide sua sponte a passion/provocation manslaughter charge. The Court decided Funderburg under a "clearly indicated" standard of review because it involved an alleged failure to provide a sua sponte instruction—the trial court had the obligation to give the instruction only if the evidence "clearly indicated" the objective elements of the offense. Id. at 82. Here, the rational-basis test applies to review the trial court's failure to provide an instruction when defendant requested it. (p. 10-11)

2. When a defendant requests a jury instruction on a lesser-included offense and is denied the requested instruction, an appellate court reviews the denial of that request, determining whether the evidence presents a rational basis on which the jury could (1) acquit the defendant of the greater charge and (2) convict the defendant of the lesser. If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error. A defendant is entitled to a lesser-included offense instruction rationally supported by the evidence, even if the instruction is inconsistent with the defense theory. (pp. 11-12)

3. Passion/provocation manslaughter is a well-established lesser-included offense of murder with four essential elements: (1) the provocation must be adequate; (2) the defendant must not have had time to cool off between the provocation and the slaying; (3) the provocation must have actually impassioned the defendant; and (4) the defendant must not have actually cooled off before the slaying. The first two elements are assessed objectively, while the third and fourth are more subjective because they relate to the defendant's actual response. To warrant the passion/provocation jury charge, the evidence must rationally support only the first two elements; the subjective elements should usually be left to the jury to determine. (pp. 12-13)

4. As to the first element, the presence of a gun or knife can satisfy the provocation requirement. Battery is also considered adequate provocation almost as a matter of law. With respect to the second element, the Court found in State v. Robinson, 136 N.J. 476, 492 (1994), that a reasonable person in the defendant's position "might not have had time to cool down between the provocation and the retaliation" where the defendant shot his uncle "almost immediately" after being provoked. (p. 14)

5. Here, a reasonable jury, viewing the evidence in the light most favorable to defendant, could believe that Hall was the first one to pull out the gun. Even if Hall did not draw the weapon, the physical struggle between Hall and defendant constituted a battery, which rises to the level of adequate provocation. There was a rational basis for a jury to find that the provocation was objectively adequate. The evidence also provides a rational basis on which to conclude there was no cooling-off period between the provocation and the shooting. (pp. 14-16)

6. Those determinations provide a sufficient basis to have warranted a passion/provocation manslaughter instruction. The instruction should have been provided as requested. The remaining elements—whether defendant was in fact provoked and whether he in fact cooled off—are left to the jury. (p. 16)

The judgment of the Appellate Division is **AFFIRMED**, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE's opinion.**

2

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

FERNANDO CARRERO, JR. (a/k/a
FIPO),

    Defendant-Respondent.


Argued March 13, 2017 – Decided May 22, 2017

On appeal from the Superior Court, Appellate
Division.

Danielle R. Grootenboer, Senior Assistant
Prosecutor, argued the cause for appellant
(Gurbir S. Grewal, Bergen County Prosecutor,
attorney; Catherine A. Foddai, Special
Deputy Attorney General/Acting Senior
Assistant Prosecutor, of counsel and on the
brief).

Marcia H. Blum, Assistant Deputy Public
Defender, argued the cause for respondent
(Joseph E. Krakora, Public Defender,
attorney).

    JUSTICE TIMPONE delivered the opinion of the Court.

    In this appeal as of right, we consider the propriety of a

passion/provocation manslaughter jury instruction.

    Defendant Fernando Carrero, Jr., was charged with the

murder of Jose Hall. Defendant's account of the shooting

differed substantially from that of Kerrilyn Lowenstein,

defendant's girlfriend, who witnessed a significant part of the event. At trial, defense counsel requested a passion/provocation manslaughter instruction, but the trial court denied the request, finding it inconsistent with defendant's own accounts of self-defense and accidental shooting. The jury convicted defendant of first-degree murder.

The majority of an Appellate Division panel reversed the murder conviction, finding that the trial court improperly declined to charge the jury on passion/provocation manslaughter. One panel member dissented, concluding that neither the State's nor the defense's presentation of the facts supported such a charge.

We find that the trial testimony presents a rational basis on which the jury could acquit defendant of murder but convict him of passion/provocation manslaughter, and accordingly we affirm. Although the passion/provocation charge is inconsistent with defendant's theories of self-defense and accidental shooting, when the evidence supports such a charge, a defendant may be entitled to the requested instruction regardless of whether the charge is consistent with the defense. State v. Brent, 137 N.J. 107, 118 (1994).

I.

We cull the following facts from the trial testimony. On November 6, 2007, Jose Hall was shot twice at Lowenstein's

2

parents' house in Lyndhurst, where Lowenstein lived.  At the time of the shooting, seventeen-year-old Lowenstein was dating defendant, who was sixteen.

Before dating defendant, Lowenstein had dated Hall's close friend, Corey Hicks.  In 2003, after Lowenstein and Hicks ended their relationship, Hicks moved into the basement of Lowenstein's house.  Lowenstein testified that she had hoped that their romantic relationship would rekindle, but that hope was unrequited.  Instead, Lowenstein indicated that she and Hicks "started to hate each other.  It was more like brother and sister; we would fight like brother and sister.  He would have girls over, I would have guys and friends over, and we just fought all the time."  Lowenstein's relationship with Hall remained stable, however; he was a frequent visitor to Lowenstein's home and was included in family celebrations.

Lowenstein began dating defendant in May 2006.  Lowenstein asserted that approximately six months into the relationship, defendant began to verbally and physically abuse her.  According to Lowenstein, defendant forbade her from seeing her friends and looking at other men, prohibited her from using her cell phone in his presence unless it was on speaker, and prevented her from doing anything else without his permission.  Defendant specifically told Lowenstein that he did not want her speaking

3

to Hicks or Hall, despite her repeated protestations that she had no romantic feelings for either of them.

Defendant persisted. Lowenstein testified about an incident that took place in July 2007, when defendant claimed that he "saw a car full of guys wearing red bandanas waiting outside his house to kill him." Defendant said that he thought Hicks and Hall were in the car and that Lowenstein had set him up. When Lowenstein explained that Hicks and Hall were in Delaware, defendant refused to believe her. To force her to confess to her part in the scheme, defendant repeatedly asked Lowenstein to admit to her role, and each time she did not, he punched her in her left temple. Lowenstein stated that this interrogation continued for at least eleven punches until she could not handle the beating any longer and felt forced to say "yes."

In another incident that took place in October 2007, defendant waited in a car outside Lowenstein's house while she went inside to retrieve a movie. Hall told Lowenstein that he ventured outside to "make a peace treaty" with defendant and that the two shook hands, agreeing that "everything was going to be okay." Defendant disputed that account, stating that Hall approached the car and told defendant to get out so they could talk. Defendant said he refused to get out because he was afraid of Hall. Defendant added that Hall was arguing with him,

4

that they never shook hands, and that as soon as Lowenstein came out of the house, Hall turned around and left.

Defendant described another argument with Hall and Hicks that occurred behind Lowenstein's house one evening. He explained that the argument was on the verge of getting physical, with Hall stating that he was "coming after" defendant, when Lowenstein's sister's boyfriend intervened.

In the week leading up to the shooting, defendant stayed overnight at Lowenstein's house. On the date of the shooting, Lowenstein's mother told her that defendant could not stay at the house that night because Hicks and Hall would be there. Defendant called his sister to ask if he could stay with her, but she did not answer. Lowenstein and defendant went to Lowenstein's house, planning to try to reach his sister again later on.

Upon arriving at Lowenstein's house, Lowenstein and defendant sat together in the living room. Hicks came up from the basement, where he had been watching a movie with his girlfriend and Hall. According to Lowenstein, Hicks stared at her and defendant before going into the kitchen. When Hicks returned to the basement, he informed Hall that defendant and Lowenstein were upstairs.

Defendant and Lowenstein went into the kitchen for food. Lowenstein testified that they were "kissing and hugging," and

5

she had her hands around his waist.  While they were sitting at the kitchen table, Hall came up from the basement.  He asked Lowenstein why she had not told him that, as a result of his girlfriend's tip about a job opening, she had secured a job at a Victoria's Secret store.  Defendant asserted that he told Hall to stop speaking to Lowenstein.

Lowenstein testified that she was fearful of an impending fight between defendant and Hall, so she left the kitchen to get her parents.  While she was out of the kitchen but near the stairs, Lowenstein indicated that she heard Hall yell, "whoa, whoa, whoa," followed by the sound of a gunshot.  She ran back to the kitchen and saw Hall lying on his back with defendant standing over him, pointing a gun at him.  Hall was lying in a defensive position saying, "whoa stop, whoa stop."  Lowenstein stated that she pleaded with defendant to "just leave."  When he did not respond, she attempted to pull defendant's arm away, but he fought off her grip.  Lowenstein testified that defendant then shot Hall in the head.

Defendant's version of the shooting differed.  He testified that, after Lowenstein left the kitchen to find her parents, Hall told him "this is the last time you're going to come in this house.  And stop talking to [Lowenstein]."  Hall then reached under his shirt and pulled a gun from his waistband.  Defendant tried to grab the gun from Hall and the gun went off

during the struggle. After the first shot, Hall fell to his knees but continued to struggle. Lowenstein reentered the room and jumped on defendant's back. During the three-way struggle for the gun, the gun fired while aimed at Hall's head.

Hicks, who was in the basement at the time of the shooting, testified that he ran upstairs after hearing yelling and "thumping" noises. When he got to the kitchen, he found Hall on the floor bleeding and saw defendant run out the back door with the gun in hand.

Hall was still alive when EMTs arrived at the house. They determined that the initial gunshot wound was not fatal, but the second wound to his head was untreatable. Hall died two days later in the hospital.

Defendant was arrested the morning after the shooting at a house in Orange. Officers recovered the gun from a black duffel bag in the home. When officers asked defendant "if anything else in the bag was his," defendant replied, "nothing but the gun." Officers later confirmed that defendant did not have a permit for the gun.

A Bergen County grand jury returned an indictment, charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); third-degree possession of a handgun

without the requisite permit, N.J.S.A. 2C:39-5(b); and third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(1).

At the close of evidence, defendant requested an instruction on passion/provocation manslaughter as a lesser-included offense of murder. Defense counsel argued that Hall's "assault" of defendant by pulling a gun on him was sufficient evidence of provocation. The State objected to the request, contending that there was no evidence that defendant had been provoked. The court denied the request, noting that the evidence of self-defense and accidental shooting were inconsistent with passion/provocation manslaughter. The jury subsequently found defendant guilty on all counts. After applicable mergers, the sentencing judge sentenced defendant to life imprisonment, subject to an eighty-five percent parole disqualifier on the first-degree murder charge, and lesser concurrent sentences on the other counts.

In a split opinion, a majority of the Appellate Division reversed defendant's conviction, concluding that, when considered in the light most favorable to defendant, the evidence adduced at trial "provide[d] a rational basis upon which a reasonable jury might make a finding of passion/provocation." The majority found defendant's testimony that Hall drew a weapon and pointed it at him supported a passion/provocation charge.

8

A dissenting panel member concluded that there was no evidence to support a passion/provocation charge and that a passion/provocation manslaughter verdict "would have required the jury to reject both defendant's and the State's versions" of events.

The State appealed to this Court as of right. R. 2:2-1(a)(2).

## II.

### A.

The State agrees with the dissent that a passion/provocation manslaughter instruction was not warranted because the evidence "bespoke self-defense instead of passion provocation." The State notes that the failure to charge on passion/provocation did not eliminate the possibility of a conviction of a lesser offense because the jury was instructed on self-defense, as well as aggravated manslaughter and reckless manslaughter.

### B.

Defendant asserts the appellate majority properly found that the trial court erred in denying his request for a passion/provocation charge. Relying on State v. Mauricio, 117 N.J. 402, 414 (1990), which acknowledged that a threat with a deadly weapon may be adequate provocation, defendant claims that

9

the dissent improperly failed to consider defendant's testimony that "the victim threatened him with a gun."

In response to the Appellate Division dissent's argument that this case is governed by this Court's decision in State v. Funderburg, 225 N.J. 66, 81 (2016), where we held that appellate courts may not construct hypothetical scenarios unsupported by evidence when determining whether a jury charge is appropriate, defendant posits that this case is distinguishable "on both the facts and the law." Specifically, defendant argues that Funderburg involved a sua sponte jury charge, which is governed by a different standard than jury charges requested by a defendant.

## III.

"Appropriate and proper charges to a jury are essential for a fair trial," State v. Daniels, 224 N.J. 168, 180 (2016), and we have repeatedly held that "erroneous instructions on material points are presumed to be reversible error," State v. Nelson, 173 N.J. 417, 446 (2002) (quoting State v. Martin, 119 N.J. 2, 15 (1990)).

### A.

As a threshold matter, we reject the assertion that Funderburg is controlling here. Rather, we view this decision as consistent with, but distinguishable from, Funderburg. In that case, we addressed the trial court's failure to provide sua

10

sponte a passion/provocation manslaughter charge when the defendant did not request the instruction. Id. at 70. The defendant in Funderburg was charged with the attempted murder of his ex-girlfriend's new boyfriend, after the victim was stabbed during a fight with the defendant. Id. at 73-74. We determined that the defendant was not entitled to a passion/provocation charge because the evidence did not "clearly indicate" that a reasonable person in the defendant's position would have been adequately provoked. Id. at 82.

Despite the similarity in factual circumstances -- a violent interaction preceded by a tense relationship between two men involved in a romantic triangle -- Funderburg does not direct the outcome here. Central to the distinction is the lack of request for the jury instruction in Funderburg and the clear request for the jury instruction here. We decided Funderburg under a "clearly indicated" standard of review because it involved an alleged failure to provide a sua sponte instruction -- the trial court had the obligation to give the instruction if the evidence "clearly indicated" the objective elements of the offense. Ibid. Here, we apply a different standard -- the rational-basis test -- to review the trial court's failure to provide a jury instruction when defendant requested it. We turn now to a discussion of the rational-basis test.

B.

11

N.J.S.A. 2C:1-8(e) mandates that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." Accordingly, when a defendant requests a jury instruction on a lesser-included offense and is denied the requested instruction, an appellate court reviews the denial of that request, determining whether "the evidence presents a rational basis on which the jury could [1] acquit the defendant of the greater charge and [2] convict the defendant of the lesser." Brent, supra, 137 N.J. at 117. If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error. Id. at 118.

The rational-basis test sets a low threshold. State v. Crisantos, 102 N.J. 265, 278 (1986). A defendant is entitled to a lesser-included offense instruction rationally supported by the evidence, even if the instruction is inconsistent with the defense theory. Brent, supra, 137 N.J. at 118; State v. Powell, 84 N.J. 305, 317 (1980); State v. Hollander, 201 N.J. Super. 453, 473 (App. Div.), certif. denied, 101 N.J. 335 (1985). In deciding whether the rational-basis test has been satisfied, the trial court must view the evidence in the light most favorable to the defendant. Mauricio, supra, 117 N.J. at 412.

In this case, we determine whether there was a rational basis for a reasonable jury to acquit defendant of murder and

12

convict defendant of passion/provocation manslaughter.

Passion/provocation manslaughter, defined as "[a] homicide which would otherwise be murder . . . [but] is committed in the heat of passion resulting from a reasonable provocation," N.J.S.A. 2C:11-4(b)(2), is a well-established lesser-included offense of murder, State v. Robinson, 136 N.J. 476, 482 (1994) (citing N.J.S.A. 2C:1-8(d)(3)).  Even though a person convicted of passion/provocation manslaughter acts with the intent to kill, "the presence of reasonable provocation, coupled with defendant's impassioned actions, establish a lesser culpability."  Id. at 482, 486.

Passion/provocation manslaughter has four essential elements:  "[1] the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying."  Mauricio, supra, 117 N.J. at 411.  The first two elements are assessed objectively, while the third and fourth are "more subjective because they relate to the defendant's actual response."  Robinson, supra, 136 N.J. at 490 (citing Mauricio, supra, 117 N.J. at 411).  To warrant the passion/provocation jury charge, the evidence must rationally support only the first two

13

elements; the subjective elements "should usually be left to the jury to determine." Mauricio, supra, 117 N.J. at 413.

As to the first element, "the provocation must be 'sufficient to arouse the passions of an ordinary [person] beyond the power of his [or her] control.'" Id. at 412 (alterations in original) (quoting State v. King, 37 N.J. 285, 301-02 (1962)). Words alone are insufficient to create adequate provocation, Crisantos, supra, 102 N.J. at 274, but the presence of a gun or knife can satisfy the provocation requirement, Mauricio, supra, 117 N.J. at 414. Battery is also considered adequate provocation "almost as a matter of law." Ibid.

With respect to the second element, the cooling-off period, we have recognized that "it is well-nigh impossible to set specific guidelines in temporal terms." Id. at 413. In Robinson, supra, however, we found that a reasonable person in the defendant's position "might not have had time to cool down between the provocation and the retaliation" where the defendant shot his uncle "almost immediately" after being provoked. 136 N.J. at 492.

C.

As a starting point, we easily conclude that defendant could have been acquitted of first-degree murder, thereby satisfying the first part of the rational-basis test, for the same reasons that charges on the lesser-included offenses of

14

reckless and negligent manslaughter were appropriate.  The only remaining issue, thus, is whether there was a rational basis for a reasonable jury to convict defendant of passion/provocation manslaughter.  We find that there was.

Although the verbal argument between Hall and defendant was insufficient provocation on its own, see Crisantos, supra, 102 N.J. at 274, the presence of the gun could have provoked a reasonable person in defendant's position, see Mauricio, supra, 117 N.J. at 414.  A reasonable jury, viewing the evidence in the light most favorable to defendant -- the only living witness to what happened in the kitchen after Lowenstein left -- could believe that Hall was the first one to pull out the gun.  Even if Hall did not draw the weapon, the physical struggle between Hall and defendant constituted a battery, which we have said rises to the level of adequate provocation.  Ibid.  We conclude that there was a rational basis for a jury to find that the provocation was objectively adequate.

The evidence also provides a rational basis on which to conclude there was no cooling-off period between the provocation and the shooting.  The first gunshot, which alone was not fatal, was fired almost immediately after Hall and defendant began arguing.  The fatal second gunshot was fired soon afterward. Thus, as in Robinson, where we found the defendant had not

15

cooled off, defendant shot the victim "almost immediately" after being provoked.

We conclude that, accepting defendant's version of the event, the alleged provocation was adequate and that the intervening time was short enough that defendant did not have time to cool off from that provocation. Those determinations provide a sufficient basis to have warranted a passion/provocation manslaughter instruction. The instruction should have been provided as requested. The remaining elements -- whether defendant was in fact provoked and whether he in fact cooled off -- are left to the jury to decide.

IV.

The judgment of the Appellate Division reversing defendant's conviction is affirmed, and the matter is remanded to the trial court for further proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE TIMPONE's opinion.